UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

DONNELL JEFFERSON,

Plaintiff,

v.                                                    ACTION NO.
                                                      4:08cv40

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,

Defendant.

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia. This Court recommends that the decision of the Commissioner be VACATED and REMANDED to the Commissioner for further proceedings consistent with this Report and Recommendation.

## I. PROCEDURAL BACKGROUND

On July 15, 2004, Plaintiff Donnell Jefferson ("Jefferson") filed an application for a period

of disability and DIB (R. 44-46)[1], alleging that he had been disabled since May 9, 2003, due to impairment of both knees (R. 60-61). The Commissioner denied Jefferson's application initially (R. 32-36), and upon reconsideration (R. 38-40). Jefferson received an administrative hearing on November 15, 2005 (R. 210-28), and the Administrative Law Judge ("ALJ") issued a written decision denying Jefferson's claim on January 13, 2006 (R. 18-24).

On April 17, 2006, the Appeals Council denied Jefferson's request for review (R. 11-13), which rendered the ALJ's decision the final decision of the Commissioner. After the Appeals Council granted several extensions of time for Jefferson to file a civil action, Jefferson timely filed the instant action for judicial review pursuant to 42 U.S.C. § 405(g). This case is now before the Court for disposition of the parties' cross-motions for summary judgment.

## II. FACTUAL BACKGROUND

Jefferson is currently 42 years old. (R. 44.) On July 15, 2002, Jefferson was diagnosed with a tear of the anterior cruciate ligament in his left knee and underwent reconstructive surgery. (R. 101, 164.) After surgery, Jefferson made good recovery until he experienced a twisting injury to his left knee at work, on May 9, 2003 (R. 164), which is the alleged onset date of Jefferson's disability. According to the earning records, Jefferson acquired quarters of coverage to remain insured through March 31, 2009. (R. 18.)

### A. Medical Evidence in the Record

On June 5, 2003, Jefferson underwent another surgery of his left knee, an arthroscopic debridement and release of articular cartilage lesions. (R. 104-07.) Post-operation, the operating physician, Dr. Cohn, reported "no complications" and stated the plan was to rehabilitate Jefferson's

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

knee. (R. 107.) On June 11, 2003, Dr. Cohn stated that Jefferson "should remain out of work" unless a "sedentary job is available." (R. 162.) Over the next couple months, Jefferson attended physical therapy, tried multiple knee braces, and received an injection of Cortisone, but the pain and popping in his knee persisted. (R. 158.) Moreover, in early August 2003, Jefferson "miss-stepped going up a step and twisted his knee." (R. 158.) Another orthopaedic specialist–filling in for Dr. Cohn–diagnosed Jefferson with a "strain of the left knee with a chronically inflamed situation since having his lateral release surgery." (R. 158-59.) On August 20, 2003, Dr. Cohn confirmed the pain and popping, but sent Jefferson out for a second opinion and instructed that "[h]e should not be working until he returns." (R. 157.)

Over the next several months, three new specialists evaluated Jefferson and reported back to Dr. Cohn. (R. 153-56.) During this time, the knee pain continued, and Jefferson became "more and more symptomatic." (R. 154.) Specifically, Jefferson experienced "a lot of grinding" and "more popping" in the knee, and could not "walk for very long periods of time." (R. 126.) On January 6, 2004, however, Jefferson stated that he was only taking Motrin for the pain. (R. 132.) With respect to work, Jefferson performed "light duty with no standing longer than five minutes, no walking more than 20 feet and no sitting longer than 20 minutes" and required elevation of his left foot. (R. 130-35.)

In January 2004, Dr. Cohn explained to Jefferson that another arthroscopic procedure would have a "50-50" chance of relieving his ongoing symptoms. (R. 153.) Jefferson elected to proceed with the surgery (R. 153), which took place on January 26, 2004 (R. 128). At the direction of Dr. Cohn, Jefferson did not return to work in the months following the surgery. (R. 150-52.) Jefferson continued physical therapy, but through March of 2004, the popping, weakness, and pain in the knee

3

did not improve. (R. 149-52.) In late March or early April, Dr. Cohn prescribed an extension lock brace and a cane, which provided "some relief." (R. 143, 149-50.)

On May 18, 2004, an orthopaedic specialist signed a Worker's Compensation form, which indicated that Jefferson's disability was "total." (R. 197.) This doctor stated that the ongoing "knee ache, pain, and discomfort" likely cannot be helped "from a non-operative perspective." (R. 145.) The doctor suggested that another arthroscopic surgery "could be efficacious," but "[c]ertainly the patient was given no assurances." (R. 145.)

On June 2, 2004, Dr. Cohn noted that Jefferson was "reluctant to pursue further surgery." (R. 148.) On June 22, 2004, Dr. Cohn discontinued physical therapy after observing that "[w]ith his new therapy, [Jefferson] is actually feeling worse than before." (R. 147.) From July through September, Dr. Cohn noted no changes in Jefferson's symptoms. (R. 146, 193.)  He prescribed Vicodin, then Ultram, for the pain. (R. 192-93.)

On December 15, 2004, Jefferson decided to not pursue another operation on his left knee. (R. 191.) As a result, Dr. Cohn declared "maximal medical improvement" as of December 15, 2004. (R. 191.) Furthermore, he declared that Jefferson had a "15% whole person impairment due to the fact that he uses a cane and brace intermittently," which was "[b]ased upon the AMA Guidelines of Evaluation of Permanent Impairment Fifth Edition, Table 17-5 pg. 529." (R. 191.) Finally, Dr. Cohn gave Jefferson permanent work restrictions, but the office evaluation memo does not list the specific restrictions. (R. 191.)

During the first half of 2005, Jefferson's condition did not change. (R. 188-90.) Dr. Cohn prescribed pain medication (Ultram), maintained Jefferson's permanent restrictions, and advised that another surgery was the only other treatment option. (R. 188-90.) The record indicates that Jefferson

4

was "having difficulty finding employment with his restrictions and his Workmans' Comp claim." (R. 188.) On June 14, 2005, Dr. Cohn completed Jefferson's Supplementary Report for Benefits, and wrote that Jefferson was "not able to work at this time." (R. 195.) On September 13, 2005, Dr. Cohn observed that Jefferson's "*right* knee gave way causing him to twist and injure his *left* knee. He had pain and swelling, and now *both knees* have been giving way on him." (R. 186)(emphasis added). On November 10, 2005, another orthopaedic specialist examined Jefferson and diagnosed "[r]ight knee anterior cruciate ligament instability with left trochanteric bursitis." (R. 199.)[2] Jefferson indicated that he did not wish to pursue surgical procedures for the right knee "due to the fact that he had so many problems with his left knee." (R. 199.)

## B. Hearing Testimony

Jefferson appeared at the hearing in a left leg brace, which extended from his ankle to his thigh. (R. 212.) Jefferson testified that he had undergone three surgeries, has two pins and two screws in the left knee, and has two pins in his Achilles. (R. 221.) He further testified to a problematic right knee, but explained that he does not have insurance and is "not able to address [his] right leg." (R. 225.) Each morning, Jefferson has to apply heating pads to his knees "just to get started." (R. 221.) Next, a friend makes him food so that Jefferson can take his medication. (R. 221.)

The testimony describes a history of complications with the prescription medication, however. Jefferson's physician, Dr. Cohn, first prescribed Vioxx, but Jefferson experienced chest

---

[2] Jefferson had not produced Dr. Bonner's medical evaluation by the hearing date with the ALJ on November 15, 2005 (R. 3, 215), but the ALJ "ke[pt] the record open" so that Dr. Bonner's written report could be submitted after the hearing and considered as evidence (R. 215-16.).

pains and shortness of breath, and was diagnosed with a heart murmur. (R. 219.) Dr. Cohn took Jefferson off of Vioxx and "tried [him] on several other medications. . . ." (R. 219.) In the first part of 2005, he prescribed Oxycodone, but Jefferson experienced dizziness, was unable to drive, and felt drowsy and sleepy within 15 minutes of taking the medication. (R. 219-20.) Jefferson further testified that these side effects would have affected his ability to perform even sedentary work duties. (R. 220.) Next, Dr. Cohn switched Jefferson to Ultram, then Tramadol (lower dose of Ultram), both of which rendered Jefferson nauseated and "incoheren[t]." (R. 217-18.) As a result, Jefferson "end[ed] up just taking one pill instead of two pills," which is insufficient for the pain. (R. 218.) At the time of the hearing, Jefferson was still taking Tramadol. (R. 217.) When asked if the side effects of Tramadol would prevent him from effectively performing sedentary work, Jefferson replied, "Yes, for sure. Because like I said, it had me nauseated a lot, and like I said, it basically shut my body down on me." (R. 218.)

Next, the testimony addressed Jefferson's work history. From 1986 to approximately January of 2004, Jefferson worked "labor intensive" jobs at two furniture companies and Industrial Marine Service, Inc. ("IMS"). (R. 47-48, 222). After going on Worker's Comp., Jefferson twice attempted returning to IMS to perform sedentary work. (R. 222.) He filled out paperwork, at most 3 hours per day, for periods of approximately 3 weeks, but could not sustain the activity. (R. 222-23.) Although Jefferson sought to call witnesses at the hearing to describe the specific nature of the sedentary work, the ALJ refused to hear the witnesses, on the ground of relevance. (R.225-26.) After his last surgery, on January 26, 2004, Jefferson did not return to work. (R. 223.) At the time of the hearing, Jefferson had been seeking employment for nearly a year, but could not find any employment, due to his work restrictions. (R. 224-25.) The ALJ did not call a Vocational Expert

("VE") to testify.

At the conclusion of the hearing, the ALJ stated, "it appears to me that the biggest issue in this case is the side effects of the medication." (R. 226.) The ALJ then framed the issue more specifically, as whether "the side effects of the medications that [Jefferson is] taking significantly reduce his ability to perform sedentary work." (R. 227.)

## III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2008); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N. Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of

7

benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial

evidence on the record, or (B) the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517

(4th Cir. 1987).

## IV. ANALYSIS

To qualify for a period of disability and DIB under sections 216(i) and 223 of the Social

Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements

of these sections, and be under a "disability" as defined in the Act. The Social Security Regulations

define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the:

> inability to do any substantial gainful activity[3] by reason of any
> medically determinable physical or mental impairment[4] which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a) (2008); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2008).  To

meet this definition, the claimant must have a "severe impairment"[5] which makes it impossible to

---

[3] "Substantial gainful activity" is work that (1) involves doing significant and productive physical or mental duties; and (2) is done (or intended) for pay or profit. 20 C.F.R. § 404.1510; § 416.910 (2008). Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized."  Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572 (2008).

[4] "Physical or mental impairment" is defined in section 223(d)(3) of the Social Security Act, Title 42 U.S.C. § 423(d)(3), as an impairment that results from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

[5] The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. §§ 404.1520(c), 416.920(c) (2008).

do previous work or any other substantial gainful activity that exists in the national economy.[6]  20

C.F.R. § 404.1505(a) (2008); see also 42 U.S.C. § 423(d)(2)(A) (2008).

The regulations promulgated by the Social Security Administration provide that all material

facts will be considered to determine whether a claimant has a disability. The Commissioner

follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must

consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe

impairment, (3) has an impairment which equals a condition contained within the Social Security

Administration's official listing of impairments, (4) has an impairment which prevents past relevant

work, and (5) has an impairment that prevents him from any substantial gainful employment. An

affirmative answer to question one, or a negative answer to question two or four, results in a

determination of no disability. An affirmative answer to question three or five establishes disability.

This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920.

**A. The ALJ's Decision**

As a preliminary matter, ALJ Cummings found that Jefferson met the insured status

requirements of the Social Security Act through March 31, 2009. (R. 1104.) ALJ Cummings then

made the following findings under the five-part test for disability: (1) Jefferson has not engaged in

substantial gainful activity since May 9, 2003 (the alleged onset date of disability); (2) Jefferson has

---

[6] The Administration may satisfy its burden by showing that considering the claimant's residual functional capacity, age, education and work experience, the claimant is either disabled or not disabled based on medical-vocational guidelines, or "grids," published at 20 C.F.R., Pt. 404, Subpt. P, App. 2 (2004). However, technical application of the grids is not always appropriate, and thus the Commissioner must rely on the testimony of a vocational expert to determine whether an individual claimant is in fact capable of performing substantial gainful activity available in significant numbers in the economy. 20 C.F.R. § 416.920(f) (2008); § 404.1520(f) (2008); Heckler v. Campbell, 461 U.S. 458, 466 (1983); SSR 83-10.

a severe impairment of osteoarthritis in both knees; (3) Jefferson's impairment did not meet one of the official impairments listed in 20 C.F.R. § 404.1520; (4) Jefferson was unable to perform past relevant work prior to expiration of insured status; and (5) "there are jobs that exist in significant number in the national economy that [Jefferson] can perform." (R. 20-23.) With respect to the fifth prong, ALJ Cummings found that Jefferson "has the residual capacity to lift and carry 10 pounds, stand or walk for 2 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday." (R. 22.) Thus, the ALJ concluded that Jefferson was capable of "the full range of sedentary work," and accordingly, was not disabled within the meaning of the Social Security Act. (R. 24.)

Jefferson argues to this Court that ALJ Cummings erred in each of the following ways: (1) "failing to have a VE present to testify;" (2) "failing to address the issue that the ALJ identified in the hearing as the biggest issue in the case [the side effects of medication];" (3) "giving improper weight to the opinion of the non-examining State Agency physician;" and (4) "finding that Mr. Jefferson was partially credible." (Pl.'s Br. at 18-23.)

**B. Vocational Expert Testimony and Discussion of Side Effects**

At the fifth prong of the five-part test for disability, "the burden shifts to the Secretary to prove that the claimant retains sufficient residual function capacity ["RFC"] to perform work available in the national economy." Harper v. Sec'y of Health and Human Servs., 1987 WL 41844, at *1 (E.D. Va. 1987)(citing Hall v. Harris, 658 F.2d 260 (4th Cir. 1981)). Jefferson argues that the ALJ failed to discharge this burden, because the ALJ improperly treated the Medical-Vocational Guidelines listed in 20 C.F.R. § 404, Subpart P, Appendix 2 (the "Grids") as conclusive in determining that Jefferson is "not disabled."

In the case where a claimant "suffers from both exertional and nonexertional limitations, the

10

[Grids] are not conclusive but may only serve as guidelines." <u>Walker v. Bowen</u>, 889 F.2d 47, 49 (4th Cir. 1989). <u>See also</u> 20 C.F.R. § 404.1569a(d). More specifically, if the claimant has "nonexertional impairments, the Secretary, in order to prevail, *must be required to prove by expert vocational testimony* that . . . specific jobs exist in the national economy which [claimant] can perform." <u>Smith v. Schweiker</u>, 719 F.2d 723, 725 (4th Cir. 1984)(emphasis added). In the Fourth Circuit, "not every nonexertional limitation or malady rises to the level of a nonexertional impairment," so the "proper inquiry . . . is whether the nonexertional condition affects an individual's [RFC] to perform work of which he is exertionally capable." <u>Walker</u>, 889 F.2d at 49.

ALJ Cummings, however, made no such inquiry. ALJ Cummings did not question a vocational expert, and instead, relied on the Grids to determine that Jefferson's RFC "allows him to perform all activities required by the full range of sedentary work." Although sole reliance on the Grids is permitted in the absence of nonexertional limitations, 20 C.F.R. § 404.1569a(b), the record contains substantial evidence that Jefferson suffers from both exertional and nonexertional limitations. A nonexertional limitation is "a limitation that is present whether the claimant is attempting to perform the physical requirements of the job or not." <u>Gory v. Schweiker</u>, 712 F.2d 929, 930 (4th Cir. 1983). In other words, nonexertional limitations "are present at all times in a claimant's life, whether during exertion or rest." <u>Id.</u> The Code of Federal Regulations provides a list of examples of potential nonexertional limitations, which includes: (a) "pain;" (b) "difficulty . . . climbing, crawling, or crouching;" and (c) "difficulty maintaining attention." 20 C.F.R. § 404.1569a(c)(1). In the present case, the record suggests that Jefferson experiences intense pain in his knees, that the pain would make climbing, crawling, or crouching difficult, and that the medication renders Jefferson nauseated, drowsy, and unable to concentrate. Thus, the record

11

contains substantial evidence that Jefferson possessed nonexertional limitations, and the ALJ should have evaluated whether these limitations amounted to "impairments," as required by Walker. 889 F.2d at 49.

Even assuming that the ALJ properly categorized Jefferson's *pain* as merely exertional,[7] the ALJ's failure to address the side effects of the medication in his decision constitutes grounds for reversal. During the hearing, ALJ Cummings stated, "it appears to me that the biggest issue in this case is the side effects of the medication." (R. 226.) The ALJ then framed the issue more specifically, as whether "the side effects of the medications . . . significantly reduce [Jefferson's] ability to perform sedentary work." (R. 227.) In his written decision, however, ALJ Cummings does not make a single reference to prescription medications,[8] or their side effects. The government defends the ALJ's omission by arguing that "none of the treatment records during the relevant period document medication side effects," but a complete reading of the record compels the opposite conclusion. First, the record contains ubiquitous documentation of heavy prescription medication for pain, including Oxycodone, Vicodin, Vioxx, Indocin, Ultracet, and Ultram. (R. 144, 152, 159, 161-62, 190, 192-93, 198, 208.) Second, the treatment records suggest that Jefferson struggled with many of the medications. On July 2, 2003, the primary treating physician, Dr. Cohn, observed that the Vioxx was "not working," and switched Jefferson to Indocin. (R. 161.) Months later, Dr. Cohn documented that Jefferson "does not care to take medications po [by mouth]." (R. 140.) On January 4, 2004, another physician noted that Jefferson "is only taking Motrin *at this time*. He is not having

---

[7] This assumption is tenuous, as explained in Sections C and D of this Report.

[8] ALJ Cummings only mentions Jefferson's consumption of Motrin (R. 22), which is an over-the-counter pain pill.

any GI [gastrointestinal] side effects with *this*, but he feels this [the Motrin] is not strong enough." (R. 132)(emphasis added). Finally, on November 23, 2004, Dr. Cohn stated that Jefferson "has had Vicodin in the past but I do not want to put him on narcotics." (R. 192.) In sum, the evidence of (a) Jefferson trying various pain medications, (b) a physician highlighting the *absence* of gastrointestinal side effects when Jefferson switched to Motrin, (c) Jefferson's aversion to oral consumption of pills, and (d) a long-time treating physician's rejection of prescribing more narcotics corroborates Jefferson's hearing testimony that he experienced side effects from the prescription medication.

In light of this evidence in the record, ALJ Cummings erred by not discussing the alleged side effects in his decision. Even if the ALJ believed that the evidence of side effects was not substantial, "the burden at this step [is] not on the claimant but on the Secretary." Harper, 1987 WL 41844, at *6. And in order to satisfy this burden, the ALJ "cannot pick and choose only the evidence that supports his position." Harris v. Comm'r of Soc. Sec., 2005 WL 1162530, at *8 (E.D. Va. 2005). Instead, "when faced with evidence in the record contradicting his conclusion, an ALJ must affirmatively reject that contradictory evidence and explain his rationale for so doing." Schoofield v. Barnhart, 220 F. Supp. 2d 512, 519 (D. Md. 2002)(citing Smith v. Heckler, 782 F.2d 1176, 1181 (4th Cir. 1986)). Although Jefferson's statements at the hearing, on their own, cannot be sufficient to establish a physical or mental impairment, 20 C.F.R. § 404.1528(a), the medical records support Jefferson's claims of side effects from the medication, as described above. Accordingly, ALJ Cummings' complete silence on the issue of side effects fails to "affirmatively reject" the evidence supporting side effects, and thus, the ALJ's decision fails to satisfy the burden of establishing Jefferson's RFC to perform sedentary work.

13

It is recommended, therefore, that the ALJ's decision be vacated and remanded for a determination of whether the side effects from the medication, considered in conjunction with the knee pain, affect Jefferson's RFC "to perform work of which he is exertionally capable." Walker, 889 F.2d at 49. Furthermore, if Jefferson's RFC to perform such work is affected, then the side effects from the medication, considered in conjunction with the knee pain, must be deemed either nonexertional impairments or a combination of exertional *and* nonexertional impairments. In either case, the ALJ *must* call a vocational expert to testify at the new hearing. See 20 C.F.R. § 404.1569a(c), (d); see also Walker, 889 F.2d at 49; Smith, 719 F.2d at 725.

## C. Weight Given to Physicians' Opinions

Jefferson contends that the ALJ erred by assigning improper weight to the opinion of the non-examining State Agency physician. In particular, Jefferson complains that the ALJ gave "significant weight" to the non-treating physician's conclusion regarding the scope of Jefferson's limitations, while at the same time discounting a large portion of Dr. Cohn's opinion.

Under the federal regulations and case law, a treating physician's opinion merits "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2); see also Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Dr. Cohn's opinion that Jefferson was unable to work, however, does not merit controlling weight. Although Dr. Cohn is a specialist in orthopaedics and each time served as Jefferson's operating surgeon, his opinion of full disability is inconsistent with both his early recommendation of sedentary work (R. 162) and his later finding of a 15% whole person disability under the AMA guidelines (R. 191). Furthermore, a statement by a physician that a claimant is "disabled" or "unable to work" cannot

be controlling, because this issue is "reserved to the Commissioner." 20 C.F.R. § 416.927(e)(1).

Even if Dr. Cohn's opinion is not controlling, however, the ALJ's reliance on the non-treating state physician's opinion is not necessarily insulated from review. First, the general rule is that the opinion of a treating physician receives more weight than the opinion of the non-treating physician. 20 C.F.R. § 416.927(d)(1). Additionally, an ALJ must articulate "good reasons" for the weight assigned to a treating physician's opinion and address the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 416.927(d)(2)-(6). Here, the factors militate against the decision of ALJ Cummings to discount the weight of Dr. Cohn's opinion. In particular, the ALJ gave "significant weight" to Dr. Cohn's *early* finding in 2003 that Jefferson could perform sedentary work, but gave only "minimal weight" to Dr. Cohn's *later* findings that Jefferson was unable to work. (R. 22.) The nature, extent, and reliability of a treatment relationship should deepen over time, not the other way around. If after several years of consistent evaluations and closely monitored referrals to specialists, Dr. Cohn developed the opinion that Jefferson was unable to work as a result of disabling knee pain, then the first two regulatory factors, and common sense, dictate that this opinion should predominate over an earlier opinion based on less evidence.

ALJ Cummings justifies his decision to discount Dr. Cohn's opinion–presumably under the fourth prong of the regulatory framework–by stating "the findings on examinations are not totally consistent with 'disabling' limitations." Id. More specifically, the ALJ cites Dr. Cohn's finding, in 2004, of only a "15% whole person impairment," and finds "[t]here is no evidence of any weakness or abnormalities in the claimant's upper extremities and the record does not document any

limitations in his ability to sit." Id. To the contrary, medical evaluations in the record, from late 2003 and January 2004, restricted Jefferson from "sitting longer than 20 minutes" and stated that Jefferson "must be able to elevate his left foot." (R. 133, 135.) Furthermore, an absence of abnormalities in the *upper* extremities is not necessarily inconsistent with disabling pain in the knees, which are located in the *lower* extremities. In sum, the majority of the regulatory factors weigh in favor of Dr. Cohn's more recent opinion that Jefferson suffers from disabling knee pain, and although there may be some inconsistency of the medical opinions, ALJ Cummings has misstated the medical evidence in the record. As a result, this Court cannot find that the ALJ supplied "good reasons" for discounting Dr. Cohn's opinion and adopting the testimony of a non-treating physician over the findings of a treating physician. Accordingly, it is recommended that the weight given to the physicians' respective opinions be vacated and remanded.

## D. Jefferson's Credibility

Jefferson argues that the ALJ erred by finding Jefferson only partially credible with respect to his statement of symptoms. Specifically, Jefferson contends that the ALJ's consideration of his refusal to pursue surgery for the right knee was improper.

Once the claimant establishes a medically determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ must then evaluate the intensity of these symptoms and determine what limitations they impose on a claimant's ability to work. 20 C.F.R. §§ 404.1529(c)(1); Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996). ALJ Cummings stated that the medical evidence "establishes the existence of medically determinable impairments," but proceeded to discount Jefferson's credibility regarding the degree of the symptoms alleged. (R. 22.) In making credibility determinations, the ALJ must consider the entire record and provide specific

reasons for the finding on credibility, supported by evidence in the record. Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985); S.S.R. 96-7p, 1996 WL 374186, at *4. Moreover, "[t]his duty of explanation . . . is especially crucial in evaluating pain. . . ." Hammond, 765 F.2d at 426. Finally, while this Court cannot make credibility determinations, it is clearly empowered to review whether the ALJ's credibility determinations, and the underlying reasons, are supported by "substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005).

ALJ Cummings found that Jefferson's subjective complaints regarding the degree of pain were only partially credible for the following reasons: (1) the complaints were not consistent with the medical examinations, including that "the record does not document any limitations in his ability to sit;" (2) Dr. Cohn found Jefferson able to perform sedentary work in July 2003 and October 2003; (3) Jefferson chose to take only Motrin for his pain in October 2003; and (4) Jefferson refused additional treatment for his right knee. (R. 22-23.) First, contrary to the ALJ's assertion, the record contains limitations on his ability to sit. Specifically, medical evaluations from late 2003 and January 2004 restricted Jefferson from "sitting longer than 20 minutes" and stated that Jefferson "must be able to elevate his left foot." (R. 133, 135.)

Second, although Dr. Cohn deemed Jefferson capable of sedentary work in 2003 (R. 156, 162), he reevaluated Jefferson in 2004 as "unable to work", and consistently reiterated this opinion through 2005 (R. 146-48, 151, 152, 186-91, 193). ALJ Cummings assigned "significant weight" to the sedentary work recommendation in 2003, but "minimal weight" to the total work restriction consistently reiterated in 2004 and 2005. (R. 22.) In isolation, this selective weighting might be

supported by substantial evidence,[9] but in light of the ALJ ignoring the limitations on Jefferson's ability to sit, and the silence regarding the side effects of the medication (see Section B), the selective weighting further suggests that the ALJ was "pick[ing] and choos[ing] only the evidence that supports his position." Harris, 2005 WL 1162530, at *8.

Third, the fact that Jefferson took only Motrin for his pain in October 2003 is not substantial evidence to undermine the credibility of Jefferson's complaints of severe pain over a period of years. The record consistently documents that Jefferson received various prescriptions for heavy pain medications, including Oxycodone, Vicodin, Vioxx, Indocin, Ultracet, and Ultram. (R. 144, 152, 159, 161-62, 190, 192-93, 198, 208.) Furthermore, there is evidence to suggest that Dr. Cohn switched Jefferson off certain medications because Jefferson had suffered gastrointestinal side effects. (See Section B; see also R. 132, 140, 161, 192.) ALJ Cummings mentioned neither the array of prescription medication nor the side effects from the medication, which again suggests that the ALJ was picking and choosing the evidence to support his position.

Fourth, the ALJ improperly discounted Jefferson's credibility based on Jefferson's refusal of surgery for his right knee. Under the federal regulations, a claimant can be denied disability benefits for failure to "follow the prescribed treatment without good reason," 20 C.F.R. § 404.1530(b), but "good reason" includes the situation where "[s]urgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment." 20 C.F.R. § 404.1530(c)(3). In the present case, Jefferson underwent *three* surgeries to repair ligament damage to his left knee, but each was unsuccessful. When doctors suggested

---

[9] In favoring the physician's early opinion that Jefferson can perform sedentary work, ALJ Cummings relies on the December 2004 office evaluation, in which the physician assigned Jefferson a "15% whole person impairment." (R. 22.)

another arthroscopic surgery, this time for ligament instability in his right knee, Jefferson refused.

Considering that his three previous arthroscopic knee surgeries proved unsuccessful, and painful,

Jefferson's refusal of arthroscopy on the right knee is justified under 20 C.F.R. § 404.1530(c)(3).

Furthermore, the Fourth Circuit has clearly stated that "[a] claimant may not be penalized for failing

to seek treatment she cannot afford." Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986). At

the hearing, the following exchange took place between ALJ Cummings and Jefferson:

> Jefferson:  . . . . And I still, like I say, I still haven't, it's not able to address my right leg --
>
> ALJ:  Because of the fact that you don't have the insurance?
>
> Jefferson:  Because of the fact that I don't have insurance. When I went to Dr. Bonner, that had to come out of my pocket because I had no insurance to, for somebody to address my right leg. (R. 225.)

The record demonstrates, therefore, that Jefferson was unable to afford another surgery, and ALJ

Cummings, in his decision, makes no factual finding to the contrary. Accordingly, Jefferson's

refusal of treatment is also justified under Lovejoy.

The protection afforded to a claimant's justified refusal of medical treatment extends to

determinations of credibility. In Lovejoy, the Fourth Circuit vacated a finding of no disability,

because "considering the Appeals Council's improper reliance on the claimant's failure to seek

treatment, the Secretary's decision that the claimant's complaints of severe disabling pain were not

credible cannot withstand substantial evidence review." 790 F.2d at 1117. Similarly, ALJ

Cummings relied on Jefferson's refusal to seek treatment in making his negative determination of

Jefferson's credibility regarding complaints of severe disabling pain. Jefferson's refusal of treatment

was clearly justified, and thus, ALJ Cummings' reliance on the refusal of treatment was improper.

In sum, ALJ Cummings downgraded Jefferson's credibility by (1) ignoring evidence that

Jefferson's physician observed limitations on his ability to sit; (2) arbitrarily weighting an early diagnosis over several consistent diagnoses later in time; (3) ignoring the abundant evidence of prescription pain medication and narcotics; and (4) improperly relying on Jefferson's justified refusal of surgery on his right knee. Although this reviewing Court owes deference to an ALJ's determination of a claimant's credibility, we can review for substantial evidence, especially when the ALJ relies on documents in the record. Johnson, 434 F.3d at 658; Lovejoy, 790 F.2d at 1117; Perkins v. Apfel, 101 F. Supp. 2d 365, 376-77 (D. Md. 2000). In Perkins, for example, the district court found that the ALJ had erred in finding the claimant "not entirely credible." The ALJ had cited a "discrepancy between [claimant's] assertions and the lack of evidence that the treating or consultative physicians who had examined her had specifically indicated that she could not lift, push or pull, and should nap." 101 F. Supp. 2d at 376. The court, however, pointed to medical reports in the record that indicated claimant "suffered from frequent weakness and fatigue." Id. at 377. Even though the evidence did not specifically address naps and the ability to push or pull, the court further held that the ALJ's determination of credibility was "not supported by substantial evidence insofar as he relied on this alleged inconsistency as a basis for rejecting [claimant's] assertions regarding her need to nap and ability to push and pull." Id. In particular, the court noted that the "statements are *not inconsistent* with the [claimant's] testimony." Id. (emphasis added).

Likewise, Jefferson's testimony of disabling pain and nausea from the medication are "not inconsistent" with the evidence in the record, including Jefferson's permanent work restrictions, limitations on his ability to move and sit, and the extensive documentation of prescription pain medication, including narcotics. The ALJ's failure to consider this evidence, combined with the improper reliance on Jefferson's justified refusal of a fourth knee surgery, persuades this Court that

ALJ Cummings' finding of partial credibility is not supported by substantial evidence. The Court recommends that the ALJ's finding regarding Jefferson's credibility be vacated and remanded.

**E. Remand In Lieu of Awarding Benefits**

The Court recommends denying Jefferson's request to award benefits at this time. Instead, a remand is necessary for the fact-finder to properly consider the facts, and the law, as recommended in this Report and Recommendation.

## V. <u>RECOMMENDATION</u>

For the foregoing reasons, the Court recommends that the final decision of the Commissioner be VACATED and REMANDED for further proceedings consistent with this Report and Recommendation. Specifically, the fact-finder must (1) determine whether the side effects from the medication, considered in conjunction with the knee pain, affect Jefferson's RFC to work; (2) involve a vocational expert in a manner consistent with Section B of this Report; (3) reevaluate the weight attributed to the physicians' opinions pursuant to Section C of this Report; and (4) reevaluate Jefferson's credibility regarding the nature and intensity of his symptoms pursuant to Section D of this Report.

## VI. **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28

U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to

the foregoing findings and recommendations within ten (10) days from the date of mailing of this

report to the objecting party, see 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of

the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules.  A

party may respond to another party's objections within ten (10) days after being served with a

copy thereof.

2. A district judge shall make a de novo determination of those portions of this report or

specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and

recommendations set forth above will result in waiver of right to appeal from a judgment of this

court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr

v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).


_____  /s/  _____
Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
May 1, 2009

22

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to each of the

following:

Barbara Evans-Yosief, Esq.
2013 Cunningham Drive
Suite 238
Hampton, Virginia 23666


Mark A. Exley, Esq.
Office of the United States Attorney
101 West Main Street
Suite 8000
Norfolk, Virginia  23510

Fernando Galindo, Clerk

By _____

Deputy Clerk

May/ , 2009

23